**RESOLUTION TRUST CORPORATION, Plaintiff,**

v.

**Ghaith R. PHARAON, Defendant.**

**No. 95–517–CIV.**

United States District Court, S.D. Florida.

Jan. 24, 1996.

---

Diane Ferraro, Friedman, Rodriguez & Ferraro, P.A., Miami, Fla., Candace Fabri,

Sachnoff & Weaver, Ltd., Chicago, Il., Sharon Zissman, Resolution Trust Corporation, Washington, D.C., for Plaintiffs.

Francisco R. Angones, Miami, Fla., John M. Newell, Whitman, Breed, Abbot & Morgan, New York City, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING PERSONAL JURISDICTION

HIGHSMITH, District Judge.

THIS CAUSE came before the Court for evidentiary hearing, held on November 17, 1995, to determine whether the exercise of personal jurisdiction over the defendant in this action is proper.

### PROCEDURAL BACKGROUND

On January 27, 1995, the Resolution Trust Corporation ("RTC") commenced this action against Defendant Ghaith R. Pharaon in the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida. The RTC's complaint asserts the following claims against Pharaon: common law fraud; aiding and abetting common law fraud; and aiding and abetting breach of fiduciary duty. All of these claims arise from Pharaon's involvement with Centrust Bank ("Centrust"), a financial institution that has been taken over by the RTC. The RTC seeks to recover losses amounting to $11 million, which the RTC claims were sustained by Centrust as a result of Pharaon's allegedly tortious activities with respect to Centrust. Pharaon is not a resident of Florida; he is a resident and citizen of Saudi Arabia.

On March 7, 1995, the Honorable Herbert Klein entered final judgment of default against Pharaon, finding that service had been properly effectuated upon him through the Florida Secretary of State and that Pharaon had failed to answer the complaint. On March 15, 1995, Pharaon removed the action to this court pursuant to 28 U.S.C. § 1345, which provides federal jurisdiction over claims asserted by agencies of the United States. In accordance with the parties' stipulation, on May 23, 1995, this Court entered an order vacating the state court default and ordering Pharaon to answer the complaint within thirty days. As part of the stipulation, Pharaon agreed not to assert the defenses of insufficiency of process and insufficiency of service of process in his answer.

On June 28, 1995, Pharaon filed his answer. In it, he asserts several affirmative defenses, including lack of jurisdiction over the person. The RTC has moved for an order striking the answer on the basis of the disentitlement doctrine. In opposition to the RTC's motion, Pharaon has argued that the doctrine should not apply in civil cases, and that, in any event, the defense of lack of personal jurisdiction makes the doctrine inapplicable in this case. In reply, the RTC offered to prove up the personal jurisdiction issue in whatever manner the Court would deem fit. In light of the parties' respective postures, the Court set an evidentiary hearing to resolve the issue of personal jurisdiction prior to addressing the applicability of the disentitlement doctrine to this action.[1]

Having received documentary and testimonial evidence, having heard arguments of counsel, and being otherwise fully advised in the premises, the Court makes its findings of fact and publishes its conclusions of law on the issue of personal jurisdiction. In this regard, the Court has determined that the exercise of personal jurisdiction over the defendant in this action is proper.

### FINDINGS OF FACT

1. Centrust was a financial institution located in Miami, Florida. At all times material to this action, David Paul, a resident of Florida, was the Chairman of the Board of Centrust and its principal shareholder.

2. Between 1987 and 1988, Pharaon acquired 748,901 shares of Centrust common

---

1. The disentitlement doctrine, which, in general terms, bars fugitives from defending actions in federal courts, has its genesis in *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970). The RTC seeks to apply the doctrine to Pharaon due to his status as a fugitive in connection with criminal charges pending against him in this district. Application of the disentitlement doctrine to Pharaon would bar him from defending this action. The Court will address the disentitlement issue in a separate order.

stock and 812,681 shares of Series 1 participating stock.

3. In January, 1984, Debra Quinton became employed by Centrust in the capacity of personal assistant to Paul. Over time, she became the manager of Paul's executive staff, which consisted of eighteen employees and was known as the Executive Office of the Chairman. Quinton remained in this position until February, 1990, at which time Centrust was closed by federal banking authorities.

4. Under Quinton's direct supervision and control, the Executive Office of the Chairman prepared and maintained numerous business records reflecting Paul's meetings, appointments, telephone communications, correspondence, and travel. In addition, Quinton was personally responsible for tracking Paul's expenses.

5. The Court finds that Quinton's knowledge regarding the affairs of the Executive Office of the Chairman is extensive and that her testimony regarding such affairs is credible. The Court further finds that the documents admitted into evidence regarding which Quinton testified were maintained as part of the records of the Executive Office of the Chairman.

6. Quinton knew Pharaon personally, having met him in Florida. She was able to recognize his voice, which she characterized as distinctive, when he telephoned the Executive Office of the Chairman. Quinton also personally knew Amer Lodhi, Pharaon's executive assistant. Quinton saw Lodhi in Miami from time to time and also spoke with him on the telephone about matters related to Pharaon.

7. Quinton maintained a personal speed dial list, which included three telephone numbers for Pharaon: his home, his office, and a Paris number. A second speed dial list, used by the office staff, included five entries for Pharaon: Cannes, "Frances", Georgia, London, and Paris.

8. Quinton also maintained a list of VIP's whose telephone calls Paul would personally take. The list included Pharaon, as well as Pharaon's executive assistant, Amer Lodhi.

9. Telephone logs were prepared and maintained in the Executive Office of the Chairman reflecting incoming calls to the office. The logs include the following information for each call: date; time; caller's name; message; and caller's telephone number.

10. The telephone logs for the year 1987 reflect that approximately twenty-three calls were received between April, 1987, and December, 1987, from Pharaon or his employees.

11. According to Quinton, similar telephone logs were maintained for the year 1988 and, to her recollection, the volume of telephone communications with Pharaon was similar in 1988 as the volume for 1987.[2]

12. In June 1987, Pharaon executed a notarized power of attorney designating Amer Lodhi as his "alter ego with respect to any and all possible matters and affairs" with the intention to give Lodhi "the greatest possible powers to act for [Pharaon]." (Exhibit # 52).

13. The Court has compared Pharaon's signature on this notarized document with signatures appearing on various documents submitted by the RTC at the evidentiary hearing. The Court expressly finds that the signature appearing on each of the following documents, which were sent to Miami, belongs to Pharaon:

· Telefax of February 15, 1998 to David Paul, thanking Paul for his first dividend check from Centrust. (Exhibit # 3)

· Copy of letter of May 3, 1988 to Darrel Dochow, a government regulator, regarding the requirement that Centrust "mark-to-market" its securities portfolio, telefaxed to David Paul. (Exhibit # 5)

· Telefax of January 25, 1989 to David Paul, regarding an overpayment by Centrust to Pharaon's account. (Exhibit # 10)

· Telefaxes of January 16, 1988 February 2, 1988 to David Paul pertaining to Pharaon's agreement to sell 50% of American

**2.** At the hearing, the RTC stated that it had been unable to locate the 1988 telephone logs among the thousands of document boxes located in the Centrust depository.

Southern Life Insurance Company to Centrust. (Exhibits # 16, 17, and 18)

· Letter of November 5, 1987 to Carlo Gritti (copy faxed to David Paul), and letter of November 27, 1987 to David Paul regarding an entity named "Lion." (Exhibits # 20 and 21)

· Telefax of January 22, 1988 to David Paul regarding travel plans in Europe. (Exhibit # 24)

· Telefax of February 15, 1988 to David Paul listing the names of the six chefs who would be catering a charitable event known as "The Chef's Dinner" at Paul's home. (Exhibit # 32)

· Telefax of April 11, 1988 to David Paul recommending a reinsurance provider for Centrust. (Exhibit # 39)

· Letter of June 14, 1988 to Jan H. van Bree (blind carbon copy to David Paul) regarding Pharaon's suggestions to Fokker for development of an executive jet. (Exhibit # 41)

In addition, the Court finds that the signature appearing on page 16 of Exhibit # 56 is Pharaon's. The Court accepts and adopts as its finding the testimony of RTC investigator Leonard Lyons that this exhibit is an internal BCCI document connected with Pharaon's application for a line of credit with BCCI's Grand Cayman office.

14. With regard to Pharaon's acquisition of Centrust stock, on July 15, 1987, Pharaon sent a telefax communication to David Paul indicating Pharaon's agreement to go along with Paul "in voting whenever such request is necessary." Pharaon adds, "consider our presence with you as a friendly presence for this block of shares as we sincerely believe in your ability to make of this investment a very profitable one for us in the long run, and the whole purpose of making this investment in the first place is our trust in your personal judgment and abilities *as a friend and partner.*" *See* Exhibit # 1 (emphasis added).

15. The Court expressly finds that this communication sets out the nature and scope of Pharaon's association with Paul during the time period relevant to this litigation. Based on this communication, as well as the tenor of Paul's and Pharaon's interaction demonstrat-

ed by the evidentiary record, the Court further finds that such association was one in which business and personal goals, as well as official and social activities, were intermingled to such a degree as to be indistinguishable.

16. Over the relevant time period, Pharaon acquired 13.7% of Centrust's common stock and 24.8% of Centrust's Series 1 participating stock. These acquisitions catapulted Pharaon to the position of Centrust's second largest single shareholder, after David Paul.

17. The Court finds that Pharaon's position as Centrust's second largest stockholder acquires added significance, for purposes of analyzing his contacts with Florida, when it is considered in the context of the close business and personal relationship that developed between Paul and Pharaon. Thus, the Court concludes that Pharaon was not merely a passive stockholder of Centrust who happened to own the second largest block of shares in Centrust. Rather, the Court finds that Pharaon developed a significant interest in Centrust's operations and, more specifically, in the problems with banking regulators that led to Centrust's ultimate demise.

18. One such problem arose in connection with the marketing of a Centrust subordinated debenture offering, which took place in the Spring of 1988. It is obvious from Pharaon's communication of May 3, 1988 to Darrel Dochow, Executive Director of the Office of Regulatory Policy, Oversight and Supervision of the Federal Home Loan Bank Board ("FHLBB") that Pharaon was significantly involved in Centrust's efforts to resolve an impasse with the FHLBB. In his letter to Dochow, Pharaon engages in an extensive discussion regarding the Centrust debenture offering, stating, "There is, realistically, only one obstacle between *us* and success, that is the question whether CenTrust must 'mark-to-market' its securities portfolio." *See* Exhibit # 5 (emphasis added).

19. Pharaon's active role on behalf of Centrust concerning the difficulties with marketing the subordinated debentures offering, is also evident in a memorandum to file authored by Debra Quinton and dated May 6, 1988. The memorandum summarizes a report of Pharaon's telephone conversation

with Dochow on May 5, 1988, during which Pharaon "relayed his concern regarding Cen-Trust's Subordinated Debenture." The memorandum continues, "Dr. Pharaon told Dochow that he and his Country had been dealing with the United States on a friendly basis for the past 25 years. They are preparing to buy the full debenture and back up CenTrust. They are also willing to step in and help other institutions and you are telling me that you won't take our money?" The memorandum closes with the notation: "Dr. Pharoan (sic) has an appointment next Tuesday with the head of the Bank Committee on Oversight to discuss the situation." *See* Exhibit # 7.

20. Despite the regulatory problems, Centrust's subordinated debenture offering went forward. On or about May 25, 1988, the Bank of Commerce and Credit International ("BCCI"), through Pharaon, purchased $25 million worth of the offering. On the following day, Pharaon was in Florida meeting with David Paul.

21. Sometime prior to July 15, 1988, Debra Quinton received a personal telephone call from Pharaon at the Executive Office of the Chairman. Pharaon advised Quinton that instructions for a wire transfer to effectuate Centrust's repurchase of BCCI's $25 million worth of Centrust subordinated debentures would be forthcoming from Amer Lodhi, Pharaon's executive assistant.

22. Around the same time, Angel Cortina, a Centrust officer, received instructions from Paul regarding Centrust's plan to repurchase the debentures from BCCI at their full face value. The Court finds Cortina's testimony credible.

23. On or about July 15, 1988, Debra Quinton received a letter marked "Strictly Confidential" from Amer Lodhi providing instructions for the repurchase transaction. The transfer of funds was to take place on July 27, 1988 via wire transfer to a BCCI account at Security Pacific International Bank in Paris. (Exhibit # 8)

24. Quinton made the notation "send securities here" and forwarded the letter to Angel Cortina. Cortina, in turn, arranged for the wire transfer of the $25 million, plus accrued interest through July 27, 1988.

25. According to Cortina's credible testimony, the actual funds for the repurchase were wired by Centrust. Ultimately, the repurchased debentures were listed in the name of Centrust Trust, a Connecticut real estate investment trust that was wholly owned by Centrust. For purposes of analyzing Pharaon's contacts with Florida, the Court finds no significance in the fact that a Connecticut entity was the ultimate depository of the repurchased debentures, since the transaction originated from Centrust's office in Miami, Florida, and the funding for the transaction was provided by Centrust.

26. Shortly after the repurchase transaction took place, a telefax was received in the Executive Office of the Chairman from BCCI's Paris office. The telefax acknowledged receipt of $25 million via the wire transfer of July 27, 1988, but not of the accrued interest. The telefax closes with a request that the accrue interest be wired immediately to the same BCCI account as the principal amount. The telefax shows a copy to Pharaon. (Exhibit # 9)

27. In further correspondence concerning the repurchase transaction, Pharaon sent a telefax to Paul on January 25, 1989, acknowledging receipt of an overpayment to Pharaon's account amounting to approximately $300,000 and indicating Pharaon's willingness to return such payment upon receipt of confirmation of the error from Paul. (Exhibit # 10)

28. In addition to his acquisition of Centrust's second largest block of shares and his involvement with the Centrust subordinated debentures offering, Pharaon had dealings with Paul concerning American Southern Insurance Company, a Pharaon-owned company. In telefaxes dated January 16, 1988 and February 2, 1988, sent by Pharaon to David Paul, Pharaon discusses their agreement to sell 50% of American Southern Life Insurance Company to Centrust. (Exhibits # 16 and 17). *See also* Exhibit # 18, a letter to Mr. Roy S. Thompson, Jr., of American Southern Insurance Company, explaining the future management plans of Pharaon and his new partner, Centrust.

29. Pharaon and Paul (on behalf of Centrust) also became involved in a joint venture involving the acquisition of a block of shares in an entity known as Hercules Industries during the period from November, 1987 until approximately January, 1989. Centrust's participation in the venture was designated as "Lion." A third individual, Carlo Gritti, also participated through an entity named "Pilar Corporation, S.A." Correspondence was received in the Executive Officer of the Chairman in relation to this venture. *See* Exhibits # 20 and 21.

30. Although much of Pharaon's involvement in the foregoing activities was effectuated via telephonic and written communications, Pharaon also traveled to Miami, Florida on several occasions during the time period that is relevant to this litigation.

31. In this regard, the Court notes that, according to the credible testimony of Debra Quinton, daily itineraries were compiled and maintained in the Executive Office of the Chairman reflecting Paul's projected activities. At the end of each day, a master copy of that day's itinerary, which recorded Paul's actual activities, was prepared and filed.

32. The itineraries for 1987 reflect visits to Miami by Pharaon on September 4 and 5, 1987, November 4, 1987, and December 13, 1987. In addition, Pharaon, his wife, and his son departed from Miami on December 21, 1987, aboard Paul's yacht, the "Grand Cru," for a two day trip.

33. The itineraries for 1988 reflect visits to Miami by Pharaon on April 1, 1988, and May 26, 1988, and a visit in December, 1988 in connection "The Chef's Dinner," a charity event held at Paul's house. In addition, Pharaon, his wife, and his son were again present on Paul's yacht, the "Grand Cru," in 1988.

34. The Court has found that the association between Pharaon and David Paul was one in which business and personal goals, as well as official and social activities, were intermingled to such a degree as to be indistinguishable. For this reason, the Court finds that Pharaon's various visits to Miami were related to Pharaon's business dealings with Paul and were not, as Pharaon argues, of a purely social nature. Indeed, the Court finds that even Pharaon's involvement in planning and his attendance at "The Chef's Dinner," a charity event held at Paul's house in Miami, were constitute activities that were similarly intertwined with Pharaon's business interests with Paul and Centrust.

## CONCLUSIONS OF LAW

### I. Standard of Review

Because the Court addressed the personal jurisdiction issue in the context of an evidentiary hearing, the RTC had the burden of establishing jurisdiction by a preponderance of the evidence. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (1990), and cases cited therein. In addition, the Court notes that the fact that Pharaon removed this case from state court does not provide a basis for a finding that Pharaon has waived this defense. *See* 5A Wright & Miller, *Federal Practice and Procedure* § 1395 (citing *Freeman v. Bee Machine Co.,* 319 U.S. 448, 63 S.Ct. 1146, 87 L.Ed. 1509 (1943)).

### II. Analytical Framework for Personal Jurisdiction Inquiry:

"The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis by the federal courts." *Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 855 (11th Cir.1990). First, the court must examine the jurisdictional issue under the forum state's long-arm statute. *Id.* at 855. Second, the court "must ascertain whether or not sufficient 'minimum contacts' exist to satisfy the Due Process Clause of the Fourteenth Amendment so that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

### A. FLORIDA'S LONG-ARM STATUTE

In this case, the RTC relies upon the following provision of the Florida's long-arm statute, Florida Statutes, Section 48.193:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself and, if he is a natural person, his personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

.  .  .  .  .

(b) Committing a tortious act within this state.

*Fla.Stat.Ann.* § 48.193(1)(b) (West 1994).

The RTC also relies on a second provision of the Florida long-arm statute, which states:

(2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

*Fla.Stat.Ann.* § 48.193(2) (West 1994).

▮ In its complaint, the RTC alleges that Pharaon engaged in tortious conduct through his activities with respect to Centrust Bank, a Florida banking institution. The Court has found that Pharaon's involvement with Centrust, his communications with David Paul and his visits to Miami were all in pursuit of an active business interest. The Court has rejected Pharaon's characterization of such activities as those of a passive investor or a mere social acquaintance. Therefore, the Court concludes that the allegations in the complaint, together with the Court's findings regarding the nature of Pharaon's involvement with Centrust, provide a sufficient predicate for the exercise of jurisdiction under section (1)(b) of the Florida long-arm statute. The Court also concludes that Pharaon's activities in connection with Centrust and the related joint-ventures in which he engaged with David Paul constitute substantial and not isolated activities within this state. Therefore, the Court finds that section (2) of the Florida long-arm statute is also applicable in this case.

### B.  *CONSTITUTIONAL DUE PROCESS*
#### *Minimum Contacts*

▮ To determine whether the exercise of personal jurisdiction is consistent with due process a court must consider whether a defendant purposefully established "minimum contacts" with the forum state. *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). The focus of "minimum contacts analysis" is whether a defendant's actions and connection with the forum state are such that he should "reasonably anticipate being haled into court there." *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). The actions of the defendant himself, or his agents, must create a "substantial connection" with the forum state. *Johnston v. Frank E. Basil, Inc.,* 802 F.2d 418, 420 (11th Cir.1986). The defendant must have "purposely availed [himself] of the privilege of conducting activities within the forum State, thus invoking the benefit and protection of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). A court must consider "the quality, nature, and extent of the activity in the forum, the foreseeability of consequences within the forum from activities outside it, and the relationship between the cause of action and the contacts," to determine whether a defendant's actions constitute "purposeful availment." *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,* 700 F.2d 1026, 1028 (5th Cir.1983), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 561 (1984).

▮ In this case, the Court has found that Pharaon and his agent Amer Lodhi engaged in frequent communications (via telephone, telefax, and mail) with David Paul in Florida during 1987 and 1988. Both Pharaon and Lodhi were personally known to Paul's executive assistant, Debra Quinton. Indeed, Quinton credibly testified that she could recognize both Pharaon's and Lodhi's voices when they called on the telephone. In addition, Pharaon visited Miami on several occasions in 1987 and 1988.

▮ The Court has found that these contacts evidenced an active business relation-

ship between Pharaon and Centrust (through Paul), and that Pharaon's visits to Miami were intertwined with such relationship, rather than being mere social visits. Therefore, Pharaon's actions and connections with Florida are of a sufficient quantity and of a nature that he should reasonably anticipate being haled into court in Florida. Indeed, the Court finds that in acquiring the second largest block of shares in Centrust, in becoming involved with Centrust's subordinate debenture offering, and in entering into various joint-ventures with Centrust through David Paul, Pharaon purposely availed himself of the privilege of conducting activities in Florida and purposely directed such activities toward Florida and its residents.

### Fairness

 Having determined that the defendant had sufficient "minimum contacts" with Florida, it then becomes necessary for the Court to ascertain "whether or not the exercise of personal jurisdiction over [the defendant] would transgress traditional notions of fair play and substantial justice." *Cable/Home*, 902 F.2d at 858. In making this determination, the court must consider: the burden on the defendant; the interests of the forum State; the plaintiff's interest in obtaining relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies. *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 113, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987).

No undue burden, financial or otherwise, is placed on Pharaon by the prosecution of this action in Florida. Pharaon is currently residing in Saudi Arabia, but he is represented by counsel in this action. Florida has an interest in this action, since Centrust was a Florida financial institution and the RTC's interest is to prosecute this action in Florida. Finally, the interstate judicial system's interest in obtaining the most efficient resolution of this controversy and the shared interest of the several states in furthering fundamental substantive social policies both point to Florida, since, in bringing this action, the RTC stands in the shoes of a former Florida financial institution.

### CONCLUSION

Based on the foregoing considerations, the Court concludes that the exercise of personal jurisdiction over Defendant Ghaith R. Pharaon in this action is proper. Accordingly, it is

ORDERED AND ADJUDGED that affirmative defense # 1, "This Court lacks jurisdiction over Pharaon," be and the same is hereby STRICKEN with prejudice from the answer.

DONE AND ORDERED.